# **EXHIBIT A**

FILED
04-30-2026
Anna Maria Hodges
Clerk of Circuit Court
2026CV004125
Honorable Reyna Morales-42
Branch 42

**STATE OF WISCONSIN CIRCUIT COURT MILWAUKEE COUNTY**

**Cudahy Dental Associates, S.C.,
6217 S Packard Ave,
Cudahy, WI 53110,**

**individually,
and on behalf of all others similarly situated,**

**Plaintiff,**

**CASE NO.:**

**-v-**

**CASE CODE: 30703**

**Delta Dental of Wisconsin, Inc.,
3100 Business Park Drive
Stevens Point, WI 54482**

**Defendant.**

## SUMMONS

THE STATE OF WISCONSIN, to Each Person Named Above as a Defendant:

You are hereby notified that the Plaintiff named above filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

Within 45 days of receiving this Summons, you must respond with a written Answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an Answer that does not follow the requirements of the statutes. The Answer must be sent or delivered to the Court, whose address is Milwaukee County Courthouse, 901 N. 9th Street, Room 104, Milwaukee, Wisconsin 53233, and to Plaintiff's attorneys, whose address is:

**BURNS BAIR LLP**
Timothy Burns
Thomas J. Clark
10 E. Doty Street, Suite 600
Madison, Wisconsin 53703

You may have an attorney help or represent you.

If you do not provide a proper Answer within 45 days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

Dated: April 30, 2026

By: */s/ Timothy W. Burns*

**BURNS BAIR LLP**
Timothy Burns
State Bar No. 1068086
Thomas J. Clark
State Bar No. 1126486
10 E. Doty Street, Suite 600
Madison, Wisconsin 53703
Telephone: (608) 467-0251
tburns@burnsbair.com
tclark@burnsbair.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Leonid Feller, P.C.
(*pro hac vice* forthcoming)
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
leonidfeller@quinnemanuel.com

**WOLLMUTH MAHER & DEUTSCH LLP**
Ronald J. Aranoff (*pro hac vice* forthcoming)
Jay S. Handlin (*pro hac vice* forthcoming)
Reuben R. Bauer (*pro hac vice* forthcoming)
500 Fifth Avenue – 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
jhandlin@wmd-law.com
rbauer@wmd-law.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory Arenson
Elana Katcher
800 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

**CARNEY, BATES, AND PULLIAM, PLLC**
William P. Creasman
One Allied Drive, Suite 1400
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
wcreasman@cbplaw.com

**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
Gregory P. Hansel
Michael S. Smith
Elizabeth F. Quinby
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
msmith@preti.com
equinby@preti.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes
Mary Ann Giorno Geppert
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
bcaldes@srkattorneys.com
mgeppert@srkattorneys.com

**BERGER MONTAGUE PC**
Eric L. Cramer
Patrick F. Madden
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
pmadden@bm.net

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
bernstein@bernlieb.com
beige@bernlieb.com

**KELLER ROHRBACK L.L.P.**
Ryan McDevitt
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
rmcdevitt@kellerrohrback.com

**MALKINSON & HALPERN, P.C.**
John R. Malkinson
33 North Dearborn Street, Suite 1540
Chicago, IL 60602
Telephone: (312) 427-9600
jmalkinson@mhtriallaw.com

**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
Simon B. Paris
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 575-3986
sparis@smbb.com

**KANTROWITZ GOLDHAMER & GRAIFMAN P.C.**
Melissa R. Emert
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
(866) 971-0927
memert@kgglaw.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com

FILED
04-30-2026
Anna Maria Hodges
Clerk of Circuit Court
2026CV004125
Honorable Reyna Morales-42
Branch 42

**STATE OF WISCONSIN CIRCUIT COURT MILWAUKEE COUNTY**

---

**Cudahy Dental Associates, S.C.,**
**6217 S Packard Ave,**
**Cudahy, WI 53110,**

**individually,**
**and on behalf of all others similarly situated,**

**Plaintiff,**

**-v-**

**Delta Dental of Wisconsin, Inc.,**
**3100 Business Park Drive**
**Stevens Point, WI 54482**

**Defendant.**

**CASE NO.:**

**CASE CODE: 30703**

---

**CLASS ACTION COMPLAINT**

---

Plaintiff Cudahy Dental Associates, S.C., individually and on behalf of all others similarly situated, brings this class action based upon personal knowledge of its own acts and upon information and belief as to all other matters alleged, including the investigation of Plaintiff's counsel, against Defendant Delta Dental of Wisconsin ("DDWI" or "Defendant").

## I. NATURE OF THE ACTION

1. This case involves DDWI's unlawful, anticompetitive, and unfair misuse of monopsony power in the Wisconsin market for dental goods and services, as defined herein. DDWI obtained and maintains this market power as a result of its coordinated unlawful conspiratorial agreement with other companies that comprise the "Delta Dental" system not to

compete among the various separate Delta Dental entities throughout the United States. DDWI holds well in excess of 50% of the market for dental goods and services in the State of Wisconsin. DDWI secured this power in Wisconsin by agreeing to the artificial territorial division of the United States among DDWI and the other Delta Dental licensees that have been assigned exclusive geographic territories throughout the U.S. (collectively, the "Delta Dental State Insurers"). DDWI is abusing its market dominance to: (1) restrict competition with the other Delta Dental State Insurers when operating under the "Delta Dental" brand (the "**Market Allocation Mechanism**"); (2) reduce the amount of reimbursement paid by DDWI to dentists and dental practices in Wisconsin who are reimbursed by Delta Dental insurance (the "**Price Fixing Mechanism**"), and (3) participate in a conspiracy to restrict competition among DDWI and non-Delta Dental brands operated by the other Delta Dental State Insurers (the "**Output Restrictions**").

2. DDWI has secured majority market share, as measured by non-party Milliman and by the National Association of Dental Plans ("NADP"), and it wields monopsony power in the market for dental goods and services, enabling it to produce anticompetitive effects, in the State of Wisconsin.

3. The unlawful agreement among DDWI and the other Delta Dental entities has harmed ***both*** dentists and dental practices—like the named Plaintiff here—that accept Delta Dental insurance (collectively, the "Dental Providers") ***and*** consumers. DDWI has artificially suppressed its reimbursements to Dental Providers in Wisconsin, but rather than pass those savings along to consumers, DDWI has continued to raise consumer premiums. This pernicious scheme causes dentists and dental practices to receive less while consumers pay more. The difference is hundreds of millions of dollars in "operating gain"—the euphemism for profits used by DDWI, which operates as a non-profit to avoid paying federal income taxes. DDWI uses those profits to pay its

executives compensation and perquisites of millions of dollars per year and to pocket hundreds of millions in capital reserves, which it uses (among other things) to fund for-profit businesses unrelated to the business of dental insurance. DDWI's supracompetitive profits are evidence of ***both*** DDWI's exercise of monopsony power in Wisconsin and of Plaintiff's damages.

4. Defendant DDWI reimburses dentists and dental practices in Wisconsin (collectively, the "Wisconsin Dental Providers") that accept Delta Dental insurance for dental goods and services provided to Delta Dental insureds under Delta Dental insurance contracts. DDWI and the other Delta Dental State Insurers are supported in turn by the Delta Dental Plans Association ("DDPA") and DeltaUSA, nationwide entities that act as administrators and watchdogs for the Delta Dental insurance plans. DDPA and DeltaUSA are funded and controlled by DDWI and the other Delta Dental State Insurers, and act as vehicles for their concerted activity, including via multiple contracts entered into by each Delta Dental State Insurer with DDPA and DeltaUSA.

5. As a result of the anticompetitive agreements and practices set out in this Complaint, Defendant DDWI has grown to become both the largest purchaser of dental goods and services and the largest provider of insurance for dental goods and services in the State of Wisconsin—just as, collectively, the Delta Dental State Insurers are both the largest purchasers of dental goods and services and the largest providers of insurance for dental services in the U.S. The Delta Dental system is larger than the next three dental insurance carriers combined. DDWI's networks are comprised of approximately 3,000 Wisconsin Dental Providers, and, collectively, the networks of all the Delta Dental State Insurers encompass nearly a quarter-million dental practices across the U.S. Delta Dental State Insurers provide dental insurance to more than 80 million people in the United States. By carving the United States into exclusive territories in which each of the

Delta Dental State Insurers is guaranteed to be free from competition from other Delta Dental State Insurers, DDWI and the other Delta Dental State Insurers have secured monopsony power over the market for dental goods and services within their assigned territories. Absent the monopsony powers and territorial protections secured to DDWI in Wisconsin as a result of the Market Allocation Mechanism, dental plan sponsors and members would have greater choice as to the dental insurance they choose to purchase in Wisconsin, and Wisconsin Dental Providers would have greater choice in the dental insurance they choose to accept from their patients.

6. DDWI and its co-conspirators have built upon the monopsony control achieved through the Market Allocation Mechanism to further unlawfully restrict competition in the markets for dental goods and services through the Price Fixing Mechanism and the Output Restrictions.

7. DDWI and its co-conspirators' price fixing takes the form of: (i) sharing confidential price information and strategies to reduce reimbursement rates among the Delta Dental State Insurers; (ii) protocols barring all Delta Dental State Insurers from reimbursing at all for certain procedure codes (*i.e.*, fixing the price for these procedure codes at $0), mandating that certain procedure codes be priced the same as a benchmark procedure code, and "recommending" prices for other procedure codes; (iii) sharing reimbursement rate information for all procedure codes through the National Provider File ("NPF") and the National Data Platform ("NDP"); and (iv) adopting an effective discount standard that effectively requires DDWI and every other Delta Dental State Insurer to have the lowest or among the lowest reimbursement rates of all competitor insurance companies. By conspiratorial agreement, DDWI sets its reimbursements at below-market rates, then abuses its monopsony control to force these rates onto the Wisconsin Dental Providers. The Wisconsin Dental Providers, faced with a large number of patients who have purchased Delta Dental insurance (and who naturally wish to be treated by a provider that accepts

it), have little or no choice but to acquiesce to DDWI's artificially low reimbursement rates. The Wisconsin Dental Providers have few or no alternative insurance plans with meaningful patient participation to accept. Absent the Price Fixing and Market Allocation Mechanisms, the Wisconsin Dental Providers would have greater choice in the dental insurance they choose to accept, and thus greater choice in the reimbursement rates received for their services. As a result of that same conspiratorial agreement to which DDWI is a party, dental providers throughout the rest of the U.S. are likewise effectively compelled to accept Delta Dental insurance and its artificially low reimbursement rates.

8. These two mechanisms are buttressed by a third: Delta Dental's Output Restrictions, which take the form of DDWI and other Delta Dental State Insurers agreeing to restrict the business of their "second brands" to avoid direct competition against Delta Dental State Insurers, particularly in the critical market segment for large employer commercial business that accounts for the overwhelming majority of the Delta Dental State Insurers' revenues and profits. In a competitive market, other Delta Dental State Insurers' second brands would compete with DDWI in Wisconsin, raising reimbursement to Wisconsin Dental Providers. Instead, the Delta Dental State Insurers have agreed not to allow Delta Dental-owned second brands to compete against Delta Dental State Insurers. As a result, those second brands have been overwhelmingly limited to market segments in which the Delta Dental brand does not compete (*e.g.*, individual and small group policies); and the Delta Dental system primarily uses second brands to underwrite Delta Dental-branded businesses for nationwide "groups of individuals" such as retirees (including those in Wisconsin). As a result of the Output Restrictions, DDWI and the other Delta Dental State Insurers—who, per the Market Allocation Mechanism, have already agreed not to compete with other Delta Dental State Insurers *under the Delta Dental brand*—have also limited their

competition with each other *under non-Delta Dental brands*. Absent the Output Restrictions, the groups who purchase dental plans for their members (and, by extension, those members) would have greater choice in the dental insurance they could choose to purchase, and the Dental Providers would have greater choice in the dental insurance they choose to accept from patients.

9. All three mechanisms have reduced competition in the market for dental goods and services in Wisconsin, just as the co-conspirators' implementation of these mechanisms have reduced competition throughout the remainder of the United States. This decreased competition has harmed Wisconsin Dental Providers (in the form of lower reimbursement rates paid to them by DDWI and reduced choice in the dental insurance plans that should be available to them), and has also harmed Wisconsin dental plan sponsors and members (in the form of higher premiums paid to DDWI, and through lower quality services offered to patients). DDWI has reaped the benefits of its anticompetitive conspiracy, as reflected in hundreds of millions of dollars used to fund lavish executive compensation well beyond that of peer companies and disproportionately large capital reserves or surpluses that far exceed any regulatory requirement, legitimate insurance purpose, or other genuine business need. The supracompetitive profits amassed by DDWI and the rest of Delta Dental are direct evidence of DDWI's exercise of monopsony power in Wisconsin and, together with the other Delta Dental State Insurers, monopsony power throughout the United States.

10. On November 26, 2019, a group of plaintiffs filed a consolidated class action complaint in the United States District Court for the Northern District of Illinois alleging violations of the Sherman Act arising from Delta Dental's conduct nationwide and seeking to certify a nationwide class. On September 4, 2020, the federal district court denied Delta Dental's motion to dismiss, finding that the allegations asserted by those plaintiffs—which are similar to the factual

allegations at issue here—stated a claim for violation of the federal antitrust laws under both a *per se* standard and the rule of reason. *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627 (N.D. Ill. 2020). On September 22, 2025, the federal district court denied certification of a nationwide class, finding, among other things, that differences in the Delta Dental State Insurers' market shares in different states and differences in the reimbursement rates paid by Delta Dental State Insurers in different states precluded certification of a single nationwide class. *In re Delta Dental Antitrust Litig.*, 800 F. Supp. 3d 898 (N.D. Ill. 2025). On January 23, 2026, the federal district court denied the federal plaintiffs' motion to amend their complaint to allege state classes in their Sherman Act case. *In re Delta Dental Antitrust Litig.*, No. 19 CV 6734 (N.D. Ill. Jan. 23, 2026), ECF 960. The federal court did ***not*** address the merits of state classes in any respect but, instead, *inter alia*, declined to undertake the burden of addressing state-based classes in favor of proceeding to summary judgment on the individual claims of the 10 named plaintiffs in the federal action. *Id.* at 2, 4.

11. Accordingly, this suit has been filed by Plaintiff to vindicate the rights of thousands of Wisconsin Dental Providers who have been systemically under-reimbursed by DDWI as a result of DDWI's participation in a monopsonistic antitrust conspiracy and related unfair and anticompetitive practices in violation of Wis. Stat. Ann. Ch. 133.

## II. PARTIES

**Plaintiff**

12. Plaintiff Cudahy Dental Associates, S.C. ("Cudahy" or "Plaintiff") is a dental services provider, Wisconsin service corporation, and a citizen of the state of Wisconsin. During the relevant time period, Cudahy provided dental goods and services to DDWI pursuant to its in-network contract with DDWI. As a result of the anticompetitive and unfair conduct of DDWI alleged herein, Cudahy was deprived of the choice of accepting dental patients under a greater number of insurance plans, which it would have in a competitive market, and was reimbursed less for providing dental goods and services than it would have been but for DDWI's anticompetitive and unfair conduct. Cudahy has been injured in its business or property as a result of DDWI's violations of Wis. Stat. Ann. Ch. 133.

**Defendant**

13. Defendant DDWI is a non-stock, nonprofit service insurance corporation, located at 3100 Business Park Drive, Stevens Point, WI 54482, with its principal place of business in Stevens Point, Wisconsin, and it has Payer # 39069. DDWI is the Delta Dental licensee for the State of Wisconsin. Throughout the class period, DDWI had market power with respect to the market for dental goods and services in the State of Wisconsin, as defined herein.

14. Through the Market Allocation Mechanism, DDWI and the other Delta Dental entities have agreed to carve up the United States into exclusive territories, each of which has been assigned to an individual Delta Dental State Insurer. As part of this agreement, the State of Wisconsin has been assigned solely to DDWI. DDWI has conspired and continues to conspire with the other Delta Dental State Insurers as described herein.

## III. SUBJECT MATTER JURISDICTION, VENUE, AND PERSONAL JURISDICTION

15. This Court has subject matter jurisdiction over the cause of action alleged in this Complaint pursuant to the Wisconsin Constitution, Article VII, § 8, and is a Court of competent jurisdiction to grant the relief requested. Plaintiff's claims for violations of Wis. Stat. Ann. Ch. 133 arise under the laws of the State of Wisconsin, are not preempted by federal law, do not challenge conduct within any federal agency's exclusive domain, and are not statutorily assigned to any other trial court.

16. Plaintiff and all of the members of the Classes, as defined herein, are citizens of the State of Wisconsin.

17. DDWI, the sole Defendant in this action, is a citizen of the State of Wisconsin, is incorporated in the State of Wisconsin, and has its principal place of business in the State of Wisconsin.

18. Defendant has entered into contracts in Wisconsin with Dental Providers who are citizens of Wisconsin. Defendant has significant business in and contacts with Wisconsin, by way of its provision of dental goods, services, and facilities to Wisconsin consumers insured by DDWI. The unlawful conduct pursuant to or in furtherance of the combination or conspiracy occurred in substantial part within the State of Wisconsin and was intended to and did substantially affect business and commerce within this State.

19. The injuries to Plaintiff and the Classes resulting from Defendant's conduct as alleged herein were incurred in the State of Wisconsin.

20. Venue is proper in this Court pursuant to Wis. Stat. Ann. § 801.50(2). Plaintiff's Provider Participation Agreement with DDWI was entered into and performed in the County of Milwaukee. Defendant conducts substantial business in and provides services in the County of

Milwaukee. The injuries that have been sustained as a result of Defendant's illegal conduct occurred in part in the County of Milwaukee.

## IV. FACTUAL BACKGROUND

### A. The Delta Dental State Insurers

21. DDWI is a not-for-profit 501(c)(4) corporation that provides insurance plans for dental goods and services in Wisconsin. Through the insurance plans it offers and administers, DDWI reimburses Wisconsin Dental Providers—the dentists and dental practices who accept patients with Delta Dental insurance—for the cost of dental goods and services provided to DDWI's subscribers in Wisconsin.

22. The other Delta Dental State Insurers with which DDWI has conspired are predominately not-for-profit entities that provide insurance plans for dental goods and services in their respective states or multi-state territories. Through the insurance plans they offer and administer, the other Delta Dental State Insurers reimburse Dental Providers—the dentists and dental practices in their states who accept patients with Delta Dental insurance—for the cost of dental goods and services provided to Delta Dental patients in state markets across the United States.

*History of DDWI and the Other Delta Dental State Insurers*

23. The earliest prepaid dental plans were created beginning in 1954-1955 when dental service corporations were formed in states such as Washington and Oregon. A dental service corporation is a legally constituted not-for-profit organization, incorporated on a state-by-state basis, that negotiates and administers contracts for dental care. The dental service plans offered by the dental service corporations were intended to provide full payment to dental service

providers, with no additional payment required from a patient for their treatment beyond an agreed copayment or deductible.

24. The dental service corporations that became DDWI and other Delta Dental State Insurers were initially formed by dentists. Over time, however, dentists have largely been removed or sidelined from the leadership of DDWI and other Delta Dental State Insurers and have been replaced by executives motivated by the prospect of obtaining multi-million-dollar annual compensation rather than by the goal of increasing public access to quality health care.

25. Notwithstanding the early alignment between DDWI's predecessor and Wisconsin dentists, in more recent times, that relationship has deteriorated badly. In 2025, the Wisconsin Dental Association ("WDA") called on the Department of Justice to monitor DDWI's purchase of 25 dental offices across the state, citing potential conflicts of interest that could adversely impact patient care. In its letter to the DOJ, the WDA expressed the concern that in dental offices owned by DDWI, "patient treatment options may be driven more by what is cost effective for the insurer than by what is clinically best for their oral health."

26. The American Dental Association's ("ADA") relationship to DDWI and the other Delta Dental State Insurers has followed a similar negative trajectory. Although the ADA initially supported the development of those entities' pre-paid dental plans, the ADA learned over time that DDWI and the other Delta Dental State Insurers have unlawfully reduced reimbursement rates paid to dentists and degraded the quality of dental services provided to patients. Ultimately, the ADA ended up suing Delta Dental.

27. Initially, the dental service corporations that became DDWI and the other Delta Dental State Insurers operated independently of one another. However, in the 1960s, the number of state dental association-sponsored service corporations increased, as did the size of the groups

and entities that sought dental care plans from the corporations. In response, in 1966, the National Association of Dental Service Plans (later renamed as the "Delta Dental Plans Association") was created to bring together and coordinate the Delta Dental State Insurers.

28. In 1967, the predecessor to the Delta Dental State Insurer for Washington began providing dental insurance programs to labor unions and sold the first multi-state dental insurance program to the International Association of Machinists. Importantly, the Delta Dental State Insurers were able to and did coordinate benefits for multi-state accounts with thousands of enrollees ***without*** the use of a "National Provider File," a "National Data Platform," or other price-fixing tools. Rather, as early as the 1960s, and continuing for at least two decades, the Delta Dental State Insurers were able to and did coordinate benefits for multi-state accounts with thousands of enrollees by ceding administration for enrollees in other states to other Delta Dental State Insurers.

29. When they began, the Delta Dental State Insurers' predecessors were independent entities, each posing a threat of potential entry into the territories of the other Delta Dental State Insurers. At that point, each entity could have competed with any or all of the others. Seizing the opportunity to hoard billions of dollars in supracompetitive profits and pay themselves lavish salaries and perquisites, executives at Delta Dental of California and the other Delta Dental State Insurers joined together under the Delta Dental brand, and conspired to free each of them—and the entire Delta Dental system—of the threat of competition from other Delta Dental State Insurers.

30. Until the late 1980s, insurance coverage for multi-state accounts was successfully provided through ceded administration. In 1987, Delta Dental of California won the bid to administer dental benefits for the Office of the Civilian Health and Medical Program of the Uniformed Services. DDWI and the other Delta Dental State Insurers used this very large account as an excuse to begin unlawfully sharing their provider data through DDPA. This led to the

creation of the National Provider File, or NPF, which DDPA made available to each of the Delta Dental State Insurers for commercial accounts in 1990, divulging pricing and reimbursement rate information for all dental goods and services nationwide. The NPF gave DDWI access to the prices charged by Dental Providers across the country and facilitated the Delta Dental State Insurers' implementation of the Price Fixing Mechanism.

*The Delta Dental State Insurers' Present Operations*

31. DDWI and the other Delta Dental State Insurers have coordinated their conduct in accordance with a series of governing agreements. These agreements include the Service Mark License Agreement, the Delta Dental Plans Association Membership Standards and Guidelines, the DeltaUSA Membership Agreement, the DeltaUSA Policies Manual (formerly known as the DeltaUSA Policy and Procedures Manual), and the DeltaUSA Processing Policy Manual (formerly known as the DeltaUSA Processing Policies Manual).

32. These agreements memorialize many, but not all, aspects of the monopsonistic conspiracy of DDWI, the other Delta Dental State Insurers, DDPA, and DeltaUSA. By way of example only, the Service Mark License Agreement assigns to DDWI and each of the other Delta Dental State Insurers their respective territories. The Delta Dental Plans Association Membership Standards and Guidelines set forth mandatory rules applicable to DDWI's operations, including, *inter alia*, requiring it to maintain certain levels of market penetration and to satisfy effective discount requirements that have the purpose and effect of lowering provider reimbursement rates in Wisconsin. The DeltaUSA Membership Agreement requires DDWI to agree to comply with the Delta Dental Plans Association Membership Standards and Guidelines. The DeltaUSA Policies Manual contains rules governing resolution of territorial disputes between DDWI and other Delta Dental State Insurers. The DeltaUSA Processing Policy Manual bars DDWI and all

the other Delta Dental State Insurers from reimbursing providers for certain procedure codes (*i.e.*, fixing the price for these procedure codes at $0) and mandates that certain procedure codes be priced the same as a benchmark procedure code.

33. DDWI and every other Delta Dental State Insurer must enter into the Service Mark License Agreement, follow the Delta Dental Plans Association Membership Standards and Guidelines, abide by the DeltaUSA Policies Manual, and comply with the DeltaUSA Processing Policy Manual.

34. DDWI offers two types of dental plans that, with minor variations, are also offered by the other Delta Dental State Insurers: (1) Delta Dental Premier; and (2) Delta Dental PPO:

a. Delta Dental Premier is a traditional fee-for-service plan that allows patients to visit any licensed dentist. Delta Dental Premier dentists are required to accept discounted reimbursement rates to participate in the Premier network. Delta Dental Premier is Delta Dental's largest dentist network.

b. Delta Dental PPO is Delta Dental's preferred provider organization plan. Under Delta Dental PPO, patients also are allowed to visit any licensed dentist. PPO dentists are required to accept reduced fees for covered procedures when treating PPO patients, and PPO reimbursement rates are typically lower than Premier reimbursement rates.

**B. <u>The Dental Providers</u>**

35. The Wisconsin Dental Providers are dentists and dental practices—including the named Plaintiff in this proceeding—who are effectively forced to accept patients insured by DDWI, and lower-than-market reimbursement for dental goods and services provided to those

patients, because of DDWI's market dominance and anticompetitive and unfair practices as described herein.

36. Dental Providers receive reduced reimbursement for dental goods and services provided to patients with Delta Dental insurance pursuant to contracts they enter into with the Delta Dental State Insurers in their respective states (the "Delta Dental Provider Agreements"). Each Delta Dental State Insurer is limited to entering into Delta Dental Provider Agreements with dentists in its allocated territory. Thus, in Wisconsin, DDWI can only enter into Delta Dental Provider Agreements with Wisconsin dentists, and no other Delta Dental State Insurer can do so. These Provider Agreements stipulate the terms, conditions, and rates under which Wisconsin Dental Providers can seek reimbursement from Delta Dental for services a dental patient elects to receive when visiting a Wisconsin Dental Provider pursuant to a Delta Dental plan.

37. DDWI actively solicits dentists and dental practices in Wisconsin to participate in the Delta Dental plans. The terms and conditions imposed by the Delta Dental Provider Agreements require that Wisconsin Dental Providers will:

a. Charge Delta Dental-insured patients the amounts established by DDWI, such that the Dental Provider can neither increase nor decrease its fees for Delta Dental-insured patients;

b. Accept an agreed-upon schedule of rates (and, where applicable, copayments) for dental goods and services as payment in full for any goods and services provided to Delta Dental insureds, and not charge the insured any further amounts other than copayments or deductibles as specified under the Delta Dental Provider Agreement;

c. Submit to audits by auditors from DDWI, who ensure that the Dental Providers are charging patients the amounts set out in the Delta Dental Provider Agreement (and ancillary manual, which is an extension of the Delta Dental Provider Agreement), and otherwise adhere to any and all conditions in the agreement (and manual);

d. Conform their operations to a manual enforced by DDWI; and

e. Accept and treat patients who are insured by a different Delta Dental State Insurer, without an assignment of benefits from the patient's Delta Dental State Insurer.

38. As outlined in more detail below, when they request reimbursement for the goods and services they provide to Delta Dental insureds, Wisconsin Dental Providers—including the named Plaintiff in this proceeding—are routinely required to accept a discount imposed by DDWI of as much as 35 percent, or more, off market rates.

39. The effective discount standard agreed upon by the conspiracy requires every Delta Dental State Insurer, including DDWI, to have the lowest (or among the lowest) reimbursement rates of all competitor insurance companies, and has the purpose and effect of broadly leading to lower-than-market reimbursements. After the effective discount standard was implemented, DDWI and other Delta Dental State Insurers agreed to keep reimbursement rates constant or to lower them. The higher the effective discount, the lower the reimbursement rate paid to dentists. As measured by third-party Milliman, Delta Dental has the highest effective discount in the country. However, despite keeping provider reimbursement rates uniformly low (or even lowering them) for a decade or more, DDWI and other Delta Dental State Insurers have contemporaneously

raised premiums to consumers—belying any claim that the effective discount standard is required to keep premiums low.

40. Moreover, the "effective discount" is not the only metric showing that Delta Dental provides the lowest provider reimbursement. Milliman—an insurance consultant that collects and reports information about the dental insurance industry, and on whose reports Delta Dental routinely relies—acknowledges that system-wide, Delta Dental has both the highest net effective discount *and* the highest net *contracted* discount. Net contracted discount does not take into account utilization; it measures only the magnitude of discounts imposed upon dentists in their contracts with insurance companies. Quite simply, highest net contracted discount means lowest reimbursements.

41. DDWI imposes "take it or leave it" reimbursement rate discounts upon Wisconsin Dental Providers by way of the Delta Dental Provider Agreements, making severe discounts an unavoidable cost of doing business with DDWI. Given DDWI's monopsony control of the Wisconsin market for dental goods and services, where DDWI holds a clear majority share of the market, Wisconsin Dental Providers are effectively forced to accept the artificially low reimbursement rates under the Delta Dental plans. The alternative would be refusing to accept Delta Dental insurance at all, and thereby losing the business of the very large number of in-network Delta Dental insureds.

42. To put it plainly, Dental Providers in Wisconsin are faced with the Hobson's choice of either (1) accepting Delta Dental patients at unreasonably discounted reimbursement rates pursuant to a Delta Dental Provider Agreement, or (2) losing access to the majority of the market, which is comprised of in-network Delta Dental patients.

**C. <u>The Relevant Goods, Services, and Geographic Markets</u>**

43. DDWI and its co-conspirators have abused their market power to artificially restrain competition in the market for dental goods and services. The relevant product market is the commercial market for dental goods and services including, but not limited to, diagnostic routine periodic examinations, bitewings, X-rays, cleanings, fluoride treatments, sealants, space maintainers, minor emergency procedures, fillings, tooth extractions, biopsy of oral tissue, frenectomy, non-surgical periodontics, endodontics, crowns, and dentures.

44. For the claims in this lawsuit, which are asserted solely against DDWI, Plaintiff pleads that the relevant geographic market is the State of Wisconsin.

**D. <u>DDWI's Market Dominance</u>**

45. DDWI wields market power in the commercial market for dental goods and services in Wisconsin, enabling it to produce anticompetitive effects throughout the State of Wisconsin. In its exclusive territory, DDWI's commercial market share equals or exceeds 50% both statewide and in the overwhelming majority of regions and three-digit zip codes in Wisconsin, as measured by Milliman and NADP, and has done so consistently across the entire class period.

46. DDWI's market power makes Delta Dental insurance a "must-have" for the overwhelming majority of Wisconsin Dental Providers. The Delta Dental buyers' cartel holds monopsony power that makes it difficult for alternative buyers to compete, thereby depressing the market price for the sale of dental goods and services. That market power means that even when DDWI has reduced reimbursement rates, it is not economically feasible for any significant number or percentage of Wisconsin Dental Providers to terminate their participating provider agreements with DDWI. As alleged herein, DDWI and other Delta Dental State Insurers have taken advantage of their market power by sharing, among themselves and across the entire Delta Dental system,

sensitive information unknown to their competitors about their respective reductions in provider reimbursement and the negligible resultant loss of providers from the Delta Dental networks. DDWI and the other Delta Dental State Insurers have taken one another's sensitive price information and related attrition experience into account in deciding how much lower to drive their own provider reimbursements, secure in the knowledge that they could pay dentists less and less while still keeping those dentists in their provider networks.

## V. FACTUAL ALLEGATIONS

### A. DDWI AND ITS CO-CONSPIRATORS ENGAGE IN AN UNLAWFUL MARKET ALLOCATION MECHANISM

47. The Market Allocation Mechanism is an agreement among DDWI and the other Delta Dental entities to limit the competition for dental goods and services in the territories where the Delta Dental State Insurers are located. That agreement is part of an unlawful horizontal conspiracy to allocate the market for dental goods and services within each of those territories, including in Wisconsin, and across the United States.

48. In furtherance of their agreement not to compete, DDWI and the other Delta Dental entities have agreed that (1) the market for dental goods and services will be divided into 39 territories, each allocated to the exclusive control of a particular Delta Dental State Insurer, and (2) the Delta Dental State Insurers will not attempt to purchase dental goods and services, or to sell dental insurance to dental plan sponsors or members, outside of each Delta Dental State Insurer's allocated territory.

49. To be allowed to sell Delta Dental-branded insurance, DDWI and every other Delta Dental State Insurer have agreed to sign the Service Mark License Agreement, whereby each Delta Dental State Insurer has the exclusive right to use Delta Dental trademarks in its assigned territory, and have signed the DeltaUSA Membership Agreement, in which they have agreed to comply with

the Delta Dental Plans Association Membership Standards and Guidelines. This means, among other things, that DDWI and every other Delta Dental State Insurer have agreed not to recruit Dental Providers outside their assigned territories and have agreed not to solicit business from employer groups outside their assigned territories. DDWI and the other Delta Dental State Insurers have further agreed that once an employer's headquarters is determined, only one Delta Dental State Insurer, deemed the "Control Plan," may bid on the business; and they have agreed to be audited for compliance with the exclusive territorial restrictions, which ensures that all the co-conspirators adhere to their collusive scheme.

50. These territorial restrictions prohibit DDWI and the other Delta Dental State Insurers from contracting with any out-of-state dentist.

51. Delta Dental State Insurers, including DDWI, routinely discuss territorial disputes to determine which of them should be the Control Plan, with the purpose of appointing a single Delta Dental State Insurer to bid. In some circumstances, one Delta Dental State Insurer will affirmatively cede a business opportunity to another. In doing so, Delta Dental State Insurers follow the territorial restrictions despite the fact that doing so is contrary to their own self-interest. In certain instances, DDWI has ceded business opportunities to other Delta Dental State Insurers; in other instances, other Delta Dental State Insurers have ceded business opportunities to DDWI.

52. If DDWI and another Delta Dental State Insurer cannot agree on which one will bid on a particular opportunity, disputes are submitted to DeltaUSA for binding adjudication.

53. To dissuade defection from their collusive agreement, if DDWI or another Delta Dental State Insurer is found to have issued a proposal without proper authority, it is submitted to DDPA for a determination of what sanctions to impose.

54. Substantial monetary fines have been imposed for Delta Dental State Insurers' violations of territorial restraints.

55. The mandated territories, sometimes also referred to as "exclusive service areas" or "ESAs," do not provide pro-competitive benefits that outweigh the harms caused by Delta Dental's territorial allocation.

56. This deliberate allocation of the territories in which each Delta Dental State Insurer can conduct its business, and the corresponding agreement that the Delta Dental State Insurers will not compete with each other for Dental Providers and dental goods and services business outside their respective allocated areas, has no legitimate insurance-based need. It does not serve to transfer or spread the risk of patients insured by Delta Dental. Nor is it a necessary component of the relationship between Delta Dental and patients with Delta Dental insurance. Instead, it serves only Delta Dental, by reducing competition in the market for dental goods and services in all of the territories in which the Delta Dental State Insurers are based—thus reducing competition in Wisconsin, in each other state market, and across the United States as a whole.

57. In the absence of the Market Allocation Mechanism, the Delta Dental State Insurers would compete to purchase dental goods and services outside of and between the territories they presently have allocated exclusively among themselves. Dentists, dental plan sponsors, and members in Kenosha, for example, would not be restricted to accepting the terms and conditions of the plans offered by DDWI (which makes all provider reimbursement decisions from its headquarters in Stevens Point). Instead, they could also consider the terms and conditions of plans offered, by way of example only, by the Delta Dental State Insurer for Illinois. DDWI and that entity would then compete for these dentists and dental insurance customers. This is only one

example. The Market Allocation Mechanism is inherently anticompetitive, economically artificial, and provides no policy or risk allocation benefit to patients.

58. Competition between DDWI and other Delta Dental State Insurers would benefit dental plan sponsors and members by driving down the premium prices that members are required to pay for such insurance, or by increasing the scope of the coverage offered under an insurance policy for the same premium price. Such competition would also give Wisconsin Dental Providers greater choice in respect of the dental insurance plans they could accept. This choice would free the providers from the dominant control and below-market reimbursement rates imposed upon them by DDWI.

59. Due to DDWI's implementation and maintenance of the Market Allocation Mechanism, Plaintiff and other Wisconsin dentists have received less reimbursement for the goods and services they provided to DDWI, and have been injured in their property and business as a result.

**B. <u>DDWI AND ITS CO-CONSPIRATORS ENGAGE IN UNLAWFUL PRICE FIXING</u>**

60. In addition to participating in the Market Allocation Mechanism, DDWI has used its dominant market position to lower the rates at which it reimburses Wisconsin Dental Providers for goods and services provided to Delta Dental insureds through DDWI's participation in the Price Fixing Mechanism.

61. The Price Fixing Mechanism is a collusive agreement reached among, and implemented through the other agreements entered between, DDWI, the other Delta Dental State Insurers, DDPA, and DeltaUSA. DDWI's price fixing takes the form of (i) sharing confidential price information and strategies to reduce reimbursement rates among the Delta Dental State Insurers, including sharing specifics quantifying the amounts by which various Delta Dental State Insurers reduced their provider reimbursements and the resulting retention of dentists in their

networks; (ii) DDWI's agreement to abide by policies and protocols requiring the Delta Dental State Insurers to deny or disallow reimbursement for certain procedure codes (*i.e.*, fixing the price for these procedure codes at $0), mandating that certain procedure codes be priced the same as a benchmark procedure code, and "recommending" prices for other procedure codes; (iii) sharing reimbursement rate information for all procedure codes through the NPF and the NDP; and (iv) adopting an effective discount standard that essentially requires DDWI to have the lowest or among the lowest reimbursement rates of all competitor insurance companies in the State.

### 1. DDWI and Other Delta Dental State Insurers Routinely Share Strategies for Reducing Reimbursement Rates

62. DDWI and the other Delta Dental State Insurers routinely share confidential pricing and dentist retention and attrition information with each other. DDPA serves as the central hub facilitating and coordinating this information sharing.

63. DDWI and other Delta Dental State Insurers rely on one another's information to evaluate whether and when to implement reductions in their own reimbursement schedules and to determine the magnitude of the reductions they implement.

64. DDWI and the other Delta Dental State Insurers also share reimbursement rate information via direct communications between and among themselves about particular CDT codes.[1] DDWI and other Delta Dental State Insurers even share much broader sets of fee information, including entire fee schedules.

65. Although DDWI and other Delta Dental State Insurers claim that possessing one another's pricing information would be of no use to them, that assertion is belied by the fact that

[1] The ADA publishes the Code on Dental Procedures and Nomenclature, listing a standardized set of Current Dental Terminology, or CDT, codes to assure consistency in documenting dental treatment. https://www.ada.org/publications/cdt.

they persist in both sharing the information and relying on it when making their own pricing decisions regarding provider reimbursement.

66. In addition to sharing information about fee reductions and CDT codes, DDWI and the other Delta Dental State Insurers have shared with one another strategies and practices for moving dentists from the Premier network (with comparatively higher reimbursement amounts) to the lower-paying PPO network to satisfy the effective discount standards they have agreed to meet.

67. Information sharing between DDWI and the other Delta Dental State Insurers also occurs at Delta Dental system-wide conferences and over e-mail, where information is shared on the changes in their fee methodologies and how those changes impact dentist attrition in their provider networks.

68. DDWI and other Delta Dental State Insurers often convey to one another details of forthcoming fee reductions weeks or even months in advance, for which there is no legitimate business purpose; and the recipients of such information, including DDWI, commonly consider it when formulating their own pricing decisions. There is no justification for DDWI's and other Delta Dental State Insurers' concerted sharing of both historical and planned reimbursement changes and resultant provider retention / attrition. Likewise, there is no justification for their systemic sharing of other confidential pricing information and strategies described in the preceding paragraphs.

**2. DDWI Follows Directives Regarding Reimbursement Rates**

69. DDWI participates in the DeltaUSA Dental Policy Committee. The meetings of the Dental Policy Committee serve as yet another forum where DDWI and other Delta Dental State Insurers share information about fee reductions.

70. Additionally, the Dental Policy Committee promulgates DeltaUSA's Processing Policy Manual. DDWI's unlawful practices follow the Processing Policy Manual's three pricing requirements, which are enforced through audits and sanctions.

71. First, DDWI has agreed to follow the Processing Policy Manual's requirement that reimbursement for many procedure codes be disallowed or denied. This policy effectively fixes the price for these procedures at $0.

72. Second, DDWI has agreed to follow the Processing Policy Manual's requirement that reimbursement for certain procedure codes be fixed at the same amount as the reimbursement for a different code.

73. Third, each year, new procedure codes are promulgated by the ADA, and DDWI follows Delta Dental's nationwide "recommendations" of specific prices for reimbursement for those codes.

**3. DDWI and the Other Delta Dental State Insurers Share Reimbursement Rate Information for All Procedure Codes through the NPF and NDP**

74. DDWI and the other Delta Dental State Insurers further facilitate their price fixing by agreeing to share reimbursement rates in two databases, the NPF and the NDP. DDWI and all other Delta Dental State Insurers upload their reimbursement rates and other information to the NPF and NDP, and all have access to the NPF and the NDP.

75. DDWI and the other Delta Dental State Insurers share all their provider reimbursement data on the NPF, including reimbursement rates, dentist information (*e.g.*, name, address, specialty), and dentist network affiliation. The NDP contains all the information from the NPF, plus additional data such as practicing provider counts, industry discount studies performed

annually by the Milliman consulting firm, and routing files, which contain subscriber data such as employer and group information.

76. Employees of DDWI and other Delta Dental State Insurers have broad access to the NPF and the NDP.

77. DDWI and other Delta Dental entities have asserted that the NPF and the NDP are necessary for claims processing on multi-state accounts, *i.e.*, so Delta Dental State Insurers can service national clients. Yet, for decades, DDWI and other Delta Dental State Insurers serviced multi-state and national accounts without the NPF or the NDP.

### 4. DDWI and the Other Delta Dental State Insurers Lower Reimbursement Rates to Satisfy an Effective Discount Standard

78. DDWI and the other Delta Dental State Insurers have conspired to agree upon an effective discount standard that requires the effective discount of DDWI and every other Delta Dental State Insurer to be in the top quartile of competitors, and requires DDWI and the other Delta Dental State Insurers to pay claims at the average of competitors in the top quartile of effective discounts. As a practical matter, the higher the effective discount, the lower the reimbursement rate paid to dentists.

79. The effective discount is calculated as the average savings across all claims paid. As described above, DDWI and the other Delta Dental State Insurers have shared strategies both for lowering the reimbursements paid to PPO and Premier dentists and for shifting dentists from the higher-paying Premier network to the lower-paying PPO network. After communicating with one another, DDWI and the other Delta Dental State Insurers have chosen to increase their effective discount rates by agreeing unlawfully to lower the reimbursements paid to providers.

80. After DDPA's implementation of the effective discount standard, DDWI affirmatively lowered its reimbursement rates.

### 5. DDWI and the Other Delta Dental State Insurers' Price Fixing Has Harmed Dental Providers

81. Because of DDWI's monopsony control of the market for dental goods and services in Wisconsin, Wisconsin dentists are effectively forced to enter into the Delta Dental Provider Agreement with DDWI, just as Dental Providers in other states are effectively forced to enter into the Delta Dental Provider Agreement with their respective Delta Dental State Insurers. The result is that Wisconsin Dental Providers, like Dental Providers elsewhere, must accept the artificially low reimbursement rates dictated in that agreement. DDWI dominates the commercial dental insurance market in Wisconsin, with market share above 50%. A Wisconsin dentist or dental practice is faced with a majority of patients who have subscribed to one of the Delta Dental insurance plans and who wish to be treated by a dentist or dental practice willing to accept that plan; that dentist or practice must accept Delta Dental's artificially low reimbursement rates.

82. With no realistic alternative, Wisconsin Dental Providers—like the Plaintiff in this Complaint—are effectively required to accept the Delta Dental Provider Agreement and its below-market rates in order to access the majority of dental patients in Wisconsin, and thereby to maintain a viable dentistry business. Indeed, DDWI recognizes that Wisconsin Dental Providers overwhelmingly have no choice but to accept the artificially low reimbursement rates that DDWI offers. As a result, DDWI has been able to deny fee increases and reduce reimbursement rates to dental providers (in the face of year-over-year inflation). At the same time, DDWI continued (and continues) to increase premiums to consumers.

83. DDWI also affirmatively forces Wisconsin Dental Providers to provide lesser care than what their professional judgment indicates is warranted, or even to forgo providing medically necessary care. Because DDWI's price-fixing conspiracy results in the denial or disallowance of reimbursement for procedures necessary for optimal care, DDWI leaves Wisconsin dentists no

alternative but to provide more limited procedures, or no procedures at all. For example, Wisconsin Dental Providers may be forced to perform a light cleaning (*i.e.*, supra-gingival) rather than a deep cleaning (*i.e.*, sub-gingival), or a tooth extraction rather than endodontic therapy and/or a crown, disadvantaging both dentists and patients as a result.

84. The Price Fixing Mechanism and the Market Allocation Mechanism give Wisconsin Dental Providers no choice but to accept below-competitive reimbursement rates as determined by DDWI via the Price Fixing Mechanism. Absent the Price Fixing Mechanism and the Market Allocation Mechanism, Wisconsin Dental Providers would have greater choice among the dental insurance plans they could accept from their patients. Wisconsin Dental Providers would then be better positioned to negotiate with DDWI for higher reimbursement rates for the goods and services they provide to insureds under Delta Dental insurance plans. As a result, DDWI's monopsonistic conspiracy has not only harmed Wisconsin Dental Providers and Wisconsin consumers, it has harmed competition itself.

85. Due to DDWI's implementation and maintenance of the Price Fixing Mechanism, Plaintiff and the Dental Providers in Wisconsin have received less reimbursement for the goods and services they provided to Delta Dental insureds and have been injured in their property and business as a result.

## C. <u>DDWI AND ITS CO-CONSPIRATORS ENGAGE IN UNLAWFUL OUTPUT RESTRICTIONS</u>

86. In addition to the Market Allocation Mechanism and the Price Fixing Mechanism, DDWI and the other Delta Dental entities have engaged in a mechanism that restricts the nature and amount of business that Delta Dental State Insurers are allowed to do outside of the "Delta Dental" brand.

87. Through their longstanding business practices, DDWI and the other Delta Dental State Insurers have the skills and knowledge required to compete with other Delta Dental plans. Although the agreements that dictate the Market Allocation Mechanism prohibit one Delta Dental State Insurer from contracting with Dental Providers and selling Delta Dental-branded dental insurance in the exclusive territory of any other Delta Dental State Insurer, those express prohibitions do not extend to non-Delta Dental-branded insurance.

88. Delta Dental State Insurers are permitted to own and operate so-called "second brands" and, ostensibly, to use those second brands to offer non-Delta Dental-branded insurance products. During the relevant period, at least seven Delta Dental State Insurers had for-profit affiliated second brands: the Delta Dental State Insurers for California (Dentegra), Illinois (TruAssure), Kansas (Surency), Massachusetts (DentaQuest), Michigan (Renaissance), Missouri (Advantica), and Rhode Island (Altus). In general, each of these second brands paid higher reimbursement to Dental Providers than the corresponding Delta Dental State Insurers. Accordingly, Wisconsin Dental Providers would benefit from increased competition if the second brands belonging to the other Delta Dental State Insurers competed against DDWI in Wisconsin.

89. When other, similar entities—like Blue Cross Blue Shield—have imposed express restrictions on second brands, they have attracted scrutiny under the antitrust laws. In an effort to avoid such scrutiny, Delta Dental has not imposed written restrictions on second brands. Nonetheless, DDWI and the other Delta Dental State Insurers have formed an unwritten agreement to restrict the business of the second brands to avoid direct competition against the Delta Dental brand—particularly in the market segment for large employer commercial business that accounts for the overwhelming majority of DDWI and the other Delta Dental State Insurers' revenues and profits.

90. In practice, the second brands of the other Delta Dental State Insurers identified above have studiously avoided actual competition with the Delta Dental brand. Thus, the second brands owned by Delta Dental State Insurers have focused their operations on underwriting Delta Dental-branded business and insuring smaller employers and individuals (for example, on insurance exchanges) where Delta Dental State Insurers generally do not compete. Overwhelmingly, these second brands have not competed for the large employer commercial business that provides the great majority of Delta Dental revenues. Pursuant to this unwritten agreement, the second brands belonging to other Delta Dental State Insurers have not competed in Wisconsin.

91. Although DDWI and the other Delta Dental entities deny that they agreed to restrict second brands in these ways, the concerted action described above can only be the result of collusion with the intention to avoid competition between second brands and Delta Dental State Insurers.

92. Additional facts demonstrate the existence of the unwritten agreement concerning second brands. DDWI and the other Delta Dental State Insurers have common motives to conspire to restrict the second brands' output: to maintain the profits from existing Delta Dental-branded business, and to sustain their market power by preventing potential competitors from entering and winning away from Delta Dental both insurance business and Dental Providers. The other Delta Dental State Insurers have acted against their own interest in agreeing to restrict the second brands' output, choosing to forsake potentially profitable business that would be available to them if they expanded into territories otherwise prohibited by the Market Allocation Mechanism.

93. The output restrictions described above amount to a significant restraint on trade in the Wisconsin market for dental goods and services because they directly limit the amount of

competition and the number of competitors in the market in which DDWI should be required to compete for customers. Absent these output restrictions, there would be greater competition for dental insurance and other dental services in Wisconsin, which would result in greater insurance choice and lower premiums for Wisconsin dental plan sponsors and members, and greater insurance choice and higher rates of reimbursement for dental goods and services provided by Wisconsin dentists and dental practices.

**D. THE SUPRACOMPETITIVE PROFITS OF DDWI AND ITS CO-CONSPIRATORS—FUNNELED INTO EXCESSIVE EXECUTIVE COMPENSATION AND CAPITAL RESERVES—ARE DIRECT EVIDENCE OF THE EXERCISE OF MONOPSONY POWER IN WISCONSIN AND THROUGHOUT THE UNITED STATES**

94. Regardless of the historical motives of its predecessor when dental service corporations began to be formed more than 70 years ago, today, DDWI (like the other Delta Dental State Insurers) is driven by corporate greed. Its excessive spending on executive compensation packages and its amassment of ever-inflating capital reserves with no legitimate business purpose to justify their magnitude contradict its proffered pro-competitive justification, *i.e.*, that supposedly it has suppressed provider reimbursements to keep its clients' and insureds' premiums low.

95. As reflected in public tax forms, from 2014-2022, DDWI and the other Delta Dental State Insurers have collected billions of dollars in operating gain—*i.e.*, profit—by increasing premiums to consumers while suppressing Dental Provider reimbursement, which fell by approximately 11% on an inflation-adjusted basis during the same period.

96. In turn, DDWI and the other Delta Dental State Insurers have used their supracompetitive profits to pay lavish salaries and perquisites and to hoard billions of dollars in capital reserves. While DDWI and most of the Delta Dental entities are nominally not-for-profit entities, their directors and executives have received lavish executive compensation as a reward for implementing and maintaining the highly profitable conspiracy described above. DDWI has

routinely paid its executives seven-figure compensation packages. As examples, DDWI paid CEO Doug Ballweg $3,850,412 and VP & Science Officer Fred Eichmiller $3,682,485 in 2020;[2] DDWI paid Chief Growth & Strategy Officer David Peterson $3,263,800 in 2021;[3] and DDWI paid Secretary and VP – Operations Pamela Gartmann $3,139,476 in 2017.[4] Similarly, based on public tax filings, between 2014 and 2021, nearly one third of Delta Dental CEOs received compensation higher than 90% of their non-profit health peers and over half received compensation that was higher than 75% of those peers.[5]

97. DDWI and the other Delta Dental State Insurers have also used their illicit revenue to build excessive capital reserves that are multiples higher than both any regulatory requirement and those of other insurers in the health industry. Risk-based capital ("RBC") ratios measure surplus level relative to risk to ensure a company's solvency, and the National Association of Insurance Commissioners ("NAIC") requires that ratio to be at least 2.0; if an insurance company's RBC falls below 2.0, regulatory intervention is deemed necessary. The capital reserves that DDWI and the other Delta Dental State Insurers have amassed far exceed the statutory requirements. Based upon public information submitted to the NAIC, from 2014 through 2021, the Delta Dental State Insurers' median RBC ratio ranged between 11.4 and 15.3, while the median range for more than 900 health insurers that report to NAIC was between 5.9 and 7.1. Similarly, during the same

---

[2] Form 990 for Delta Dental of Wisconsin, Inc., 2020 (Part VII).

[3] Form 990 for Delta Dental of Wisconsin, Inc., 2021 (Part VII).

[4] Form 990 for Delta Dental of Wisconsin, Inc., 2017 (Part VII).

[5] For the purposes of executive compensation, peers are defined as non-profit entities with NTEE code E (Health Care) operating in the U.S. with revenue of 1/10 to 10 times the revenue of the corresponding Delta Dental entity.

period, the Delta Dental State Insurers' average RBC ratio was 12.3 compared to their peers' (*i.e.*, other dental insurers')[6] average of 7.9.

98. According to its public filings, DDWI's surplus ***doubled*** from $186,071,879 in 2014 to $373,109,539 in 2024. These excessive capital reserves serve no legitimate insurance purpose or other genuine business need.

99. Together, the exorbitant salaries and bulging reserves demonstrate that DDWI (like its co-conspirators) is in fact motivated to, and does, derive significant supracompetitive profits from its anticompetitive practices.

## E. DDWI'S ANTICOMPETITIVE CONDUCT VIOLATES WIS. STAT. ANN. CH. 133 UNDER THE *PER SE*, QUICK LOOK, AND RULE OF REASON STANDARDS, AND ITS AGREEMENTS SHOULD BE ENJOINED

100. DDWI's conduct in engaging in the Market Allocation Mechanism, the Price Fixing Mechanism, and the Output Restrictions is *per se* anticompetitive.

101. DDWI possesses market power in Wisconsin; the unlawful contract, combination, or conspiracy has significant anticompetitive effects in respect of non-substitutable products within the relevant product and geographic markets; and the conspiracy has no or insufficient pro-competitive justifications when measured against the anticompetitive conduct alleged. Thus, DDWI is liable for each mechanism of the alleged trust even under a rule-of-reason analysis.

102. As alleged herein, DDWI has exercised its market power to achieve significantly anticompetitive purposes with few or no compensatory features in respect of each aspect of the alleged conspiracy.

[6] For the purposes of calculating reserves, the Delta Dental State Insurers' peers are defined as dental insurance companies whose main operations are dental and do not generally contain other insurance services as a major component of their business.

103. Absent the Market Allocation Mechanism, the Price Fixing Mechanism, and the Output Restrictions, DDWI would compete with the other Delta Dental State Insurers in the market for dental goods and services in Wisconsin and in a way that would naturally produce higher reimbursement rates for Wisconsin Dental Providers and/or lower premiums for dental insurance plan sponsors and members in Wisconsin.

104. In order to remedy its anticompetitive practices, Defendant DDWI should be enjoined from conforming to and implementing the Market Allocation Mechanism.

105. Likewise, the Price Fixing Mechanism is anticompetitive because it results in DDWI and the other Delta Dental State Insurers sharing price information and agreeing among themselves to rates at which they will reimburse Dental Providers, allowing DDWI to abuse its monopsony control to artificially impose lower rates on Wisconsin Dental Providers. Defendant DDWI should be enjoined from colluding to set the reimbursement rates offered to Dental Providers.

106. The Output Restrictions are also anticompetitive because they limit the amount of business DDWI and other Delta Dental State Insurers can generate under non-Delta Dental insurance plans, *i.e.*, second brands. These restrictions prevent Delta Dental State Insurers from developing and offering dental insurance plans under their second brands that would compete with Delta Dental plan offerings. DDWI should be enjoined from agreeing to prevent second brands from competing with it in the State of Wisconsin. Such an injunction will give dental plan sponsors, providers, and members greater choice in dental insurance.

## F. PLAINTIFF HAS SUFFERED ANTITRUST INJURY

107. Plaintiff has suffered antitrust injury in respect of each of the three mechanisms of the Delta Dental trust described herein.

108. The Market Allocation Mechanism is an illegal horizontal market allocation agreement and has caused antitrust injury to Plaintiff. By allocating the markets in which the Delta Dental State Insurers can offer dental insurance, DDWI has restrained competition in a way that has reduced the number of insurance plans available to dental patients served by Wisconsin Dental Providers, and thus restrained competition among dental insurance providers for the reimbursement rates offered to Wisconsin Dental Providers. Wisconsin Dental Providers—faced with DDWI's market dominance in its allocated territory, and with the other Delta Dental State Insurers' refusal to conduct business and compete in Wisconsin—are faced with a "take it or leave it" scenario for the reimbursement rates they are offered by DDWI in Wisconsin.

109. Absent the Market Allocation Mechanism, there would be more competition among dental insurers for the dental goods and services business of dentists and dental practices, and for the insurance premium business of dental plan sponsors and members. This competition would increase the reimbursement rates available to Wisconsin Dental Providers. This competition also would decrease the premiums (or increase the coverage) available to dental plan sponsors and members.

110. The Price Fixing Mechanism has caused antitrust injury to Plaintiff. By colluding to reduce the reimbursement rates paid by DDWI to Wisconsin Dental Providers, rather than allowing those rates to be set by competition among DDWI and the other Delta Dental State Insurers, DDWI has reduced competition and set artificially low the amounts that Wisconsin Dental Providers receive as reimbursement for goods and services provided to Delta Dental insureds. Absent the conspiracy, competition among DDWI and the other Delta Dental State Insurers would naturally lead to higher reimbursement rates for Wisconsin Dental Providers.

111. The Output Restrictions have caused antitrust injury to Plaintiff. By colluding to prevent second brands from competing with Delta Dental State Insurers' Delta Dental-branded business, DDWI (like the other Delta Dental State Insurers) has directly reduced the amount of competition in the market for dental goods and services. Absent the restrictions, the other Delta Dental State Insurers would conduct more dental insurance business in Wisconsin in competition with DDWI. This increased competition would again result in increased reimbursement rates to Wisconsin Dental Providers, who would have the choice of accepting patients (and thus reimbursement rates) under more insurance plans, and not just the Delta Dental plans from DDWI.

112. The Dental Providers in Wisconsin have suffered direct harm as a result of DDWI's and the other Delta Dental entities' anticompetitive and unfair acts and conspiracy. DDWI has market power in Wisconsin. While a Wisconsin dentist may decline to become a member of DDWI's network, or decide not to accept Delta Dental insurance, to do so means being denied access to the largest group of potential dental patients because there are significant disincentives for patients to seek treatment by an "out-of-network" dentist; this is particularly acute because, in Wisconsin, DDWI holds a dominant share of the market.

113. Given its market power, DDWI can and does (a) charge Wisconsin consumers insurance premiums in excess of what they would otherwise be in a competitive market, (b) pay Wisconsin Dental Providers below-market rates for services rendered to Delta Dental insureds pursuant to the Delta Dental Provider Agreement, and (c) retain the difference as a supracompetitive profit without being taxed upon it due to DDWI's "non-profit" status.

114. DDWI has exerted its monopsony power to pay lower reimbursements to Wisconsin Dental Providers. Since 2011, GDP per capita, mean U.S. household income, and the average salary for a physician have been slowly and steadily growing. By contrast, however,

dentists on average have seen regular and consistent *declines* in their earnings, despite the broader healthcare trend.

115. Moreover, the negative trends in the incomes of dentists and dental practices do *not* exist in those segments of the dental market where DDWI is not present and exercising its monopsony powers. For example, dental insurance does not typically cover cosmetic procedures. As a result, patients do not select the dentists from whom they receive cosmetic dental services based on the insurance plans accepted by those dentists. Instead, dentists who provide cosmetic dental procedures are free to do so at the prices they set, and are not subject to the reimbursement rates provided by dental insurers like DDWI. Rates and revenues in the cosmetic dentistry market are thus free from significant interference by DDWI. Unsurprisingly, and in stark contrast to the markets for dental services in which Delta Dental State Insurers do operate, the market for cosmetic dentistry has grown and is projected to continue growing in the near future.[7]

116. This example makes clear the impact of DDWI's control over Wisconsin Dental Providers. In Wisconsin, the members of the Classes (defined below) have lost and will continue to lose earnings because DDWI has used its monopsony power to depress reimbursement rates for dental goods and services, as compared to a competitive market environment—just as, in their respective assigned territories, the other Delta Dental State Insurers have used their monopsony power to depress reimbursement rates for dental goods and services, as compared to a competitive market environment.

[7] Grand View Research, U.S. Cosmetic Dentistry Market Size & Outlook, 2022-2030 (2022).

## VI. CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action on behalf of itself and all others similarly situated as a class action pursuant to Wis. Stat. Ann. § 803.08(1) and (2)(a) and 2(b), and seeks injunctive relief on behalf of the following class (the "Injunction Class"):

a. All Dental Providers, not owned, employed by, or involved in the management or directorship of DDWI or of any of the other Delta Dental entities identified herein, who are citizens of the State of Wisconsin, and who provide dental goods or services within the State of Wisconsin and were reimbursed by DDWI.

118. Plaintiff brings this action on behalf of itself and all others similarly situated as a class action pursuant to Wis. Stat. Ann. § 803.08(1) and (2)(a) and 2(c), and seeks monetary damages on behalf of the following class (the "Damages Class"):

a. All Dental Providers, not owned, employed by, or involved in the management or directorship of DDWI or of any of the other Delta Dental entities identified herein, who are citizens of the State of Wisconsin, provided dental goods or services to a Delta Dental insured in the State of Wisconsin, and were reimbursed directly by DDWI, and were subject to a Delta Dental participating provider agreement (excluding HMO and public entitlement plans) from April 30, 2020 through the present (the "Class Period").

119. Plaintiff reserves the right to amend or modify the class descriptions with greater specificity, or further subdivision into subclasses or limitation as to particular issues.

120. Plaintiff may sue on behalf of the Injunction Class and the Damages Class (collectively, the "Classes") because:

a. The Classes are so numerous that joinder of all members is impracticable. The Classes number in the thousands, the exact number and their identities being known by DDWI.

b. Questions of law and fact are common to the Classes, including but not limited to the following:

i. Whether DDWI possesses monopsony power over the Classes;

ii. Whether DDWI conspired with co-conspirators to allocate markets horizontally;

iii. Whether DDWI conspired with co-conspirators to share price information;

iv. Whether DDWI conspired with co-conspirators to fix, stabilize, or reduce the amounts of reimbursements to Dental Providers;

v. Whether DDWI conspired with co-conspirators to restrict output by placing artificial and anticompetitive limitations on the use of second brands;

vi. Whether the Classes suffered antitrust injury;

vii. Whether DDWI's conduct in respect of the Market Allocation Mechanism as alleged in this Complaint caused damages to the Damages Class and the method of calculating the amount and extent of those damages;

viii. Whether DDWI's conduct in respect of the Price Fixing Mechanism as alleged in this Complaint caused damages to the Damages Class and the method of calculating the amount and extent of those damages;

ix. Whether DDWI's conduct in respect of the Output Restrictions Mechanism as alleged in this Complaint caused damages to the Damages Class and the method of calculating the amount and extent of those damages;

x. Whether DDWI's conduct in respect of the three above-described mechanisms combined in full, or in part, caused damages to Plaintiff and other members of the Damages Class and the method of calculating the amount and extent of those damages; and

xi. Whether DDWI's conduct as alleged in this Complaint should be enjoined.

c. Plaintiff is a member of the Classes, has claims that are typical of the claims of the members of the Classes because all members of the Classes were injured, and may continue to be injured, in the same manner by DDWI and its co-conspirators' unlawful, anticompetitive, and inequitable methods, acts, and practices. Plaintiff has interests coincident with and not antagonistic to those of the other members of the Classes, and will fairly and adequately protect the interests of the members of the Classes.

d. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation and who will fully and adequately protect the interests of all members of the Classes.

e. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications.

f. DDWI has acted on grounds that apply generally to the Classes, so that final injunctive relief is appropriate respecting the Classes as a whole.

g. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to market power, liability, and damages.

h. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. The Classes are readily definable, records for the Classes should exist in the files of DDWI, and a class action will eliminate the possibility of repetitious litigation.

i. Class treatment will also permit the adjudication of relatively small claims by many members of the Classes who otherwise could not afford to litigate claims such as those asserted in this Complaint.

j. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CAUSE OF ACTION

### For Violation of Wis. Stat. Ann. Ch. 133

121. Plaintiff, on behalf of itself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendant DDWI as follows:

122. Beginning at a date unknown to Plaintiff and continuing thereafter up until the present, Defendant and its co-conspirators entered into and engaged in a contract, combination, or conspiracy for the purpose of unreasonably restraining trade in violation of Wis. Stat. Ann. Ch. 133.

123. The unlawful contract, combination, or conspiracy entered into by Defendant and its co-conspirators has included concerted action and undertakings with the purpose and effect of (a) allocating markets for dental goods and services horizontally, (b) sharing price information and fixing, stabilizing, or reducing prices (*i.e.*, the amounts of reimbursements to Dental Providers), and (c) restricting output by placing artificial and anticompetitive limitations on the use of second brands.

124. The unlawful contract, combination, or conspiracy among Defendant and its co-conspirators has had the following effects, among others:

a. Competition between Defendant and other Delta Dental State Insurers in Wisconsin has been suppressed, restrained, and eliminated;

b. Defendant and the other Delta Dental State Insurers have fixed prices in Wisconsin, specifically fixing the amounts that can be charged and reimbursed for dental goods and services in Wisconsin;

c. Competition between Defendant and second brands of other Delta Dental State Insurers in Wisconsin has been suppressed, restrained, and eliminated; and

d. Plaintiff and the members of the Classes have received lower reimbursement from Defendant than it otherwise would have received in the absence of Defendant's unlawful combinations and contracts with its co-conspirators, and, as a direct and proximate result, Plaintiff and the members of the Classes have been deprived of the benefits of free and fair competition on the merits.

125. The acts done by Defendant as part of, and in furtherance of, its contracts, combinations, or conspiracies were authorized, ordered, or done by its officers, directors, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

126. Defendant's contracts, combinations, and/or conspiracies constitute *per se* violations of Wis. Stat. Ann. Ch. 133, and, in any event, would also violate Wis. Stat. Ann. Ch. 133 under a rule of reason analysis.

127. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered injury in its business and property, having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than it would have but for the illegal contract, combination, or conspiracy between Defendant and its co-conspirators, incurring damages in an amount according to proof at trial. As a result of Defendant's

violation of Wis. Stat. Ann. Ch. 133, Plaintiff seeks treble damages and the costs of suit, including reasonable attorneys' fees.

128. In addition, Defendant's unlawful conduct threatens to continue to injure Plaintiff. Therefore, Plaintiff on behalf of itself and the members of the Injunction Class seeks a permanent injunction prohibiting Defendant from continuing its illegal trust and ordering it to take appropriate remedial action to correct and eliminate any remaining effects of any of the conspiracy.

129. Plaintiff reserves the right to seek preliminary injunctions as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes of similarly situated persons and entities, prays that this Court enter judgment on its behalf and that of the Classes by adjudging and decreeing that:

a. This action may be maintained as a class action under Wis. Stat. Ann. § 803.08, certifying Plaintiff as representative of the Class, and designating Plaintiff's counsel as counsel for the Classes;

b. Defendant has engaged in a contract, combination, or conspiracy in violation of Wis. Stat. Ann. Ch. 133, and Plaintiff and the members of the Classes have been damaged and injured in their business and property as a result of this violation.

c. The alleged contract, combination, or conspiracy be adjudged and decreed to be a violation of Wis. Stat. Ann. Ch. 133;

d. Defendant is permanently enjoined from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which it or any other Delta Dental State Insurers may compete;

e. Defendant is permanently enjoined from continuing with its Market Allocation, Price Fixing, and Output Restrictions, and is ordered to remedy all effects and vestiges of that conduct;

f. Defendant is permanently enjoined from continuing with any other conduct determined to violate Wis. Stat. Ann. Ch. 133;

g. Defendant is permanently enjoined from retaliating against any Plaintiff or member of the Classes for participation in the litigation or enforcement of any remedy;

h. Defendant must provide ongoing periodic reporting on compliance, must submit to monitoring by the Court, and must establish a process through which members of the Classes will be represented regarding any compliance issue at Defendant's cost, all of which should continue until Defendant shows that it has corrected the effects of its illegal conduct;

i. Plaintiff and the Damages Class are awarded threefold the damages determined to have been sustained by them as a result of the conduct of Defendant complained of herein, as provided in Wis. Stat. Ann. Ch. 133, and judgment shall be entered against Defendant for the amount so determined;

j. Defendant be required to provide restitution and disgorgement of all of Defendant's ill-gotten gains as allowed by law and equity as determined to have been sustained by Plaintiff and the Classes, together with the costs of suit, including reasonable attorneys' fees;

k. Plaintiff and the Damages Class are awarded pre- and post-judgment interest at the highest legal rate from and after the date of service of the initial Complaint in this action;

l. Defendant is financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to members of the Classes; and

m. Plaintiff and the Classes are awarded any such other and further relief as the Court may deem just and proper, including such additional relief as the Court may deem just and proper to restore competition and to redress, dissipate the anticompetitive effects of, and prevent recurrence of Defendant's violations.

## JURY DEMAND

Plaintiff hereby demands a jury trial for all issues so triable.

Dated: April 30, 2026

Respectfully submitted,

By: *<u>/s/ Timothy W. Burns</u>*
**BURNS BAIR LLP**
Timothy Burns
Thomas J. Clark
East Doty Street, Suite 600
Madison, Wisconsin 53703
Telephone: (608) 467-0251
tburns@burnsbair.com
tclark@burnsbair.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Leonid Feller, P.C.
(*pro hac vice* forthcoming)
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: (312) 705-7400
leonidfeller@quinnemanuel.com

**WOLLMUTH MAHER & DEUTSCH LLP**
Ronald J. Aranoff (*pro hac vice* forthcoming)
Jay S. Handlin (*pro hac vice* forthcoming)
Reuben R. Bauer (*pro hac vice* forthcoming)
500 Fifth Avenue – 12th Floor
New York, New York 10110
Telephone: (212) 382-3300
raranoff@wmd-law.com
jhandlin@wmd-law.com
rbauer@wmd-law.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Gregory Arenson
Elana Katcher
800 Third Avenue
New York, New York 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

**CARNEY, BATES, AND PULLIAM, PLLC**
William P. Creasman
One Allied Drive, Suite 1400
Little Rock, Arkansas 72201
Telephone: (501) 312-8500
wcreasman@cbplaw.com

**PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP**
Gregory P. Hansel
Michael S. Smith
Elizabeth F. Quinby
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
msmith@preti.com
equinby@preti.com

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes
Mary Ann Giorno Geppert
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
bcaldes@srkattorneys.com
mgeppert@srkattorneys.com

**BERGER MONTAGUE PC**
Eric L. Cramer
Patrick F. Madden
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
pmadden@bm.net

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Stephanie M. Beige
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
bernstein@bernlieb.com
beige@bernlieb.com

**KELLER ROHRBACK L.L.P.**
Ryan McDevitt
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
rmcdevitt@kellerrohrback.com

**MALKINSON & HALPERN, P.C.**
John R. Malkinson
33 North Dearborn Street, Suite 1540
Chicago, IL 60602
Telephone: (312) 427-9600
jmalkinson@mhtriallaw.com

**SALTZ, MONGELUZZI, & BENDESKY, P.C.**
Simon B. Paris
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Telephone: (215) 575-3986
sparis@smbb.com

**KANTROWITZ GOLDHAMER & GRAIFMAN P.C.**
Melissa R. Emert
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
(866) 971-0927
memert@kgglaw.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000 ext. 12
dmclafferty@mclaffertylaw.com